STATE OF LOUISIANA

VERSUS

ISAIAH DOYLE

NO. 21-KA-257

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 05-5262, DIVISION "C"
HONORABLE JUNE B. DARENSBURG, JUDGE PRESIDING

December 22, 2021

**JOHN J. MOLAISON, JR.**
**JUDGE**

Panel composed of Judges Jude G. Gravois,
Marc E. Johnson, and John J. Molaison, Jr.

**CONVICTION AND SENTENCE AFFIRMED**
    **JJM**
    **JGG**

**DISSENTS WITH REASONS**
    **MEJ**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
Honorable Paul D. Connick, Jr.
Thomas J. Butler
Darren A. Allemand
Jacqueline F. Maloney
Vincent J. Paciera, Jr.

COUNSEL FOR DEFENDANT/APPELLANT,
ISAIAH DOYLE
Richard J. Bourke
Christine M. Lehmann

**MOLAISON, J.**

The defendant appeals his conviction for first degree murder. For the reasons that follow, we affirm.

## PROCEDURAL HISTORY

On November 5, 2005, a grand jury in Jefferson Parish returned a true bill of indictment that charged the defendant, Isaiah Doyle, with one count of first degree murder, in violation of La. R.S. 14:30. On March 8, 2006, the defendant was found incompetent to stand trial and he was remanded to the Eastern Louisiana Mental Health System-Forensic Division on June 7, 2007. Co-defendant, Jose Rojas, filed motions to suppress confession, evidence, and identification in case number 05-5961, on May 4, 2007, that were later adopted by defendant. On March 19, 2008, following a hearing, the defendant was found competent to stand trial by the district court.

On June 5 and July 31, 2009, suppression hearings were held but left open. On August 24, 2009, a suppression hearing was held, after which the trial court denied defendant's motion to suppress statements. On December 14, 2009, the trial court granted the defendant's motion to represent himself and, on that same date, he withdrew a plea of not guilty and entered pleas of not guilty by reason of insanity. On December 17, 2009, the defendant was held in contempt of court and sentenced to six months in parish prison. Afterwards, on that same date, the trial court ordered the Louisiana Capital Conflict Panel to represent the defendant, and on January 13, 2010, the trial court ordered the Baton Rouge Capital Conflict Office to represent him as well.

On March 11, 2011, defense counsel filed a motion for psychiatric evaluation which asserted that, as the trial approached, the defendant's "mental condition is deteriorating to the point where he is not able to assist counsel." On March 14, 2011, while the defendant was represented by counsel, the district court

commenced a competency hearing. At the conclusion of the hearing, the defendant was found competent to stand trial. Jury selection began on that same date. At an arraignment on March 19, 2011, the defendant pled not guilty and not guilty by reason of insanity. On March 21, 2011, the defendant filed a Motion to Quash the Venire that was denied.

On March 21, 2011, the State made an oral motion *in limine* to preclude the defense from entering evidence of mental retardation during the guilt phase of trial, and the court granted the State's motion. The defendant subsequently filed a writ with this Court challenging that ruling. On March 22, 2011, this Court denied the writ in part and granted it in part. *See, State v. Doyle*, 11-K-306 (La. App. 5 Cir. 3/22/11) (unpublished writ disposition). The defendant then filed a writ with the Louisiana Supreme Court challenging this Court's ruling. On March 23, 2011, the Louisiana Supreme Court granted the writ and found that this Court erred by requiring the trial court to give the jury a limiting instruction that it was not to consider evidence of mental retardation, defect, and/or diminished capacity as having any bearing on the defendant's mental capacity at the time of the offense. *See State v. Doyle*, 11-597 (La. 3/23/11), 56 So.3d 948.

Trial commenced on March 21, 2011, and at the conclusion of trial on March 24, 2011, the defendant was found guilty as charged. The penalty phase of the trial commenced on March 25, 2011, and the jury returned a verdict of death by lethal injection. The defendant appeared for sentencing on July 25, 2011. At that time, defense counsel filed "Motion To Continue Sentencing and Omnibus Motion For New Trial, For Arrest Of Judgment, To Bar The Death Penalty And For Relief From Discrimination In Jury Selection." The trial court denied the motion to continue sentencing and continued the remaining two motions. On July 27, 2011, the trial court denied the defendant's motions for new trial, arrest of judgment, and to bar the death penalty before imposing the jury's unanimous death sentence. On

August 29, 2011, the defendant filed a motion for reconsideration of sentence, which was denied by the trial court on November 2, 2011. A second motion for new trial was filed on March 28, 2012, and denied on May 1, 2013. The defendant's motion for appeal was granted on September 22, 2014.

On November 17, 2017, the Louisiana Supreme Court issued an order which stated that it had reviewed the trial court's determination on June 23, 2017, that the defendant was not competent to proceed on appeal. The supreme court concluded that this finding was supported by the record, and remanded the matter a second time for the trial court to determine whether the defendant was irrestorably incompetent. On March 22, 2019, in a sealed *per curiam*, the trial court did, in fact, determine that the defendant was irrestorably incompetent. The supreme court affirmed that finding on September 29, 2020, and remanded the case to the trial court to determine whether the defendant lacks the capacity to understand the death penalty in this case, such that he may not be executed and to determine whether resentencing was appropriate. On January 14, 2021, the district court determined that the defendant lacked the capacity to understand the death penalty such that he could not be executed and, on January 19, 2021, the defendant's death sentence was vacated and he was resentenced to life imprisonment without the benefit of parole, probation or suspension of sentence. An order of appeal to this Court was signed by the trial court on February 1, 2021, and the instant appeal followed.[1]

**FACTS**

It was established at trial that on the morning of August 4, 2005, the victim, Ms. Hwa Lee, was found dead from multiple gunshot wounds on the floor of ACE Convenience Store ("ACE"),[2] where she worked as a cashier at her family's

---

[1] When the defendant's death sentence was vacated, this Court obtained jurisdiction over the non-capital appeal pursuant to La. Const. Art. V, § 10. The record in the instant case is designated as a second appeal; however, it is noted that the first appeal was with the Louisiana Supreme Court.

[2] The transcript refers to this store as "ACE Convenience Store."

business on Barataria Blvd., which is on the Westbank of Jefferson Parish. Dr. Karen Ross, a forensic pathologist, testified that she conducted an autopsy on Ms. Lee on August 5, 2005. Dr. Ross documented four gunshot wounds: one in the head, two on the right side of the chest, and another on left side of the abdomen. Dr. Ross determined that the cause of Ms. Lee's death was multiple gunshot wounds and the manner of death was homicide.

Three witnesses at trial recounted events they personally observed on the morning of August 4, 2005. Robert Zang testified that he was doing construction work in the area and went into ACE at approximately 7:00 a.m. At that time, he got a cup of coffee and walked to the register. Behind the counter, he saw a body on the floor. James Rome testified that he was near ACE, sitting on a bench, at approximately 7:00 on the morning of August 4, 2005. He saw a grey Cadillac with a bright neon green "no insurance" sticker drive into the parking lot and stop. A man in the front passenger seat, wearing jeans and a hooded shirt, got out of the car and pulled the hood over his head before entering ACE. Mr. Rome did not see anyone give direction to the passenger from the Cadillac. Mr. Rome did not recall the race of the hooded man at the time of trial, but did recall that the man appeared to be "loaded" or wobbly on his feet. Mr. Rome saw the hooded man exit the store nervously, but did not see where the man went in because of traffic. Kyron Walker testified that on the morning of August 4, 2005, just before 7:00 a.m., he was driving northbound on Barataria Boulevard when he heard gunshots. He saw someone with a hood over his head run from ACE and get into a grey Cadillac that had a "no insurance" sticker on it. Mr. Walker later identified the car for police.

Captain Dennis Thornton testified that on August 4, 2005, he was a shift supervisor in the homicide division of the Jefferson Parish Sheriff's Office ("JPSO"). He was called to the scene at ACE and informed that there was a female victim who died after being shot in a robbery. Capt. Thornton then assigned

Sergeant Donald Meunier as the case officer responsible for working with crime scene and criminal laboratory personnel to investigate the location of the murder/robbery.[3] Capt. Thornton stated that he prepared a scene sketch and an evidence key, and later prepared a report. He recounted that there were many items of evidentiary interest at the ACE crime scene, including ballistic material such as shell casings, and shoe prints. He identified that the gun used in the murder, which produced a fired cartridge case and a projectile bullet found at the scene behind the store counter, was a Hi-Point semi-automatic 45 pistol. Capt. Thornton was present when the search warrant for the Cadillac was executed, during which time the gun at issue was located in the car. He noted that the gun's magazine still had live rounds in it.[4]

Sergeant Dax Russo testified that on August 4, 2005, he was a deputy working for JPSO and participated in an investigation of a first degree murder that took place at the ACE Convenience Store. As part of that investigation, Sgt. Russo downloaded video from the store's surveillance system which showed a suspect entering the store, firing a gun at the victim, and leaving.

JPSO Deputy Michael Burgess testified that he was on duty on August 4, 2005, when he responded to an all-points bulletin for an older model grey Cadillac with a "no insurance" sticker on it. He saw the Cadillac driving toward him and he made eye contact with the car's two occupants. When Deputy Burgess saw that the Cadillac had a "no insurance" sticker on the back of it, he made decision to activate his unit's lights and siren to pull the car over. When the car ultimately did pull over, he approached with his weapon drawn. The driver of the Cadillac then

---

[3] Capt. Thornton indicted that Sgt. Meunier's duties on the scene entailed noting, documenting, and photographing all pertinent evidence, including the victim and ballistic material, along with video evidence, and making that part of the larger case for eventual prosecution.

[4] At the conclusion of testimony by Louise Walzer, an expert in firearms and tool mark examination, the defendant stipulated that the four bullets and casing retrieved from ACE Convenience Store by Capt. Thornton were fired by the gun found in the Cadillac owned by co-defendant Jose Rojas.

put the car into reverse, at which time Deputy Burgess commanded him to stop the car and told both of the car's occupants to put their hands on the dashboard. While the driver complied immediately, the passenger did not. Eventually, the passenger complied and backup arrived. Deputy Burgess identified a photo of the Cadillac with the "no insurance" sticker that he pulled over that date. He further noted that while interacting with the car's occupants, neither appeared to be intoxicated or on drugs. Deputy Burgess also testified that a Hispanic male was driving the Cadillac.[5] JPSO Sgt. Lori Arnaud testified that she assisted Deputy Burgess in making the stop of the Cadillac on August 4, 2005. She removed the defendant, Isaiah Doyle, from a seated position in the car. She identified the defendant in open court. She explained that she called EMS to have the defendant evaluated at the scene because he was sweating profusely and shaking. However, EMS cleared the defendant to be transported following arrest. Sgt. Arnaud stated that she did not have a conversation with defendant on the date of his arrest.

Sergeant John Carroll[6] testified that on August 4, 2005, he was a JPSO supervisor in the robbery division. On that date, he interviewed the Cadillac's owner and driver, Jose Rojas, and the defendant. Prior to the defendant giving a statement, Carroll reviewed a rights of arrestee form with him. The defendant indicated he understood his rights and did not appear to be intoxicated or under the influence of drugs at that time. Carroll said that the defendant spoke to him after reviewing his rights. Specifically, the defendant waived his rights and gave a recorded statement.

Transcripts of the interviews with the defendant were entered into evidence, and tapes of the interviews were played for the jury. In State's Exhibit 2, which is

---

[5] The driver of the Cadillac in which the defendant was found was co-defendant, Jose Rojas.

[6] The transcript reflects that at the time of trial, John Carroll was no longer employed by the JPSO and was referred to as "Mr. Carroll" during his testimony.

a transcription of the defendant's statement given at 1:20 p.m. on August 4, 2005, after being advised of his rights, the defendant confessed to going into ACE that morning with a gun and shooting Ms. Lee. The defendant asserted that he was coerced into doing so by Jose Rojas and unnamed "Latin Kings" gang members, who the defendant claimed threatened to kill his family if he did not go through with the robbery. The defendant also asserted in his statement that he did not deliberately shoot Ms. Lee, but that the gun went off when she tried to grab it. The defendant also admitted to attempting to rob another Westbank convenience store with a gun in the early morning hours of August 4, 2005.[7]

Lieutenant Don Meunier testified that on August 4, 2005, he was a shift supervisor in the homicide division of the JPSO and was assigned to oversee the investigation of a murder/robbery at ACE. He was present when the search warrant was executed for the Cadillac, and recalled that a weapon was recovered, along with two packs of Kool cigarettes and two lighters. Lt. Meunier interviewed the defendant after going over the rights of arrestee form with him,[8] and testified that

---

[7] The State presented other crimes evidence at trial regarding this attempted armed robbery. Geneva Glapion-Refuge testified that at 1:45 a.m. on August 4, 2005, she was working behind the counter at the Shell Station on Cousins Blvd. in Jefferson Parish, across the street from ACE Convenience Store. At that time, a man entered the store with a grocery bag, approached her and directed her to fill up the bag with money or he would shoot her. The man saw customers pull into the lot, so he grabbed the bag and said he would come back to shoot her. Ms. Refuge called the police and was eventually shown a lineup, from which she identified the defendant as the person who attempted to rob her. She also identified the defendant in open court as the man who attempted to rob the gas station.

Kenneth Smith testified that on August 4, 2005, at approximately 4:10 a.m., he was seated in his car outside of a friend's house when an old model grey Cadillac with a yellow "no insurance" tag on the back pulled up. A black man from the car asked him, "Where is the green?" When Mr. Smith indicated that he did not know what the man was talking about, the man pulled a black automatic gun from beneath his shirt. The man then went to driver's side door, told Mr. Smith to get out and, when Mr. Smith complied, then man "penned" him to the car. The man then asked about "the green" again and told Mr. Smith that the "green" was "weed." The man then held a gun to Mr. Smith's head and asked where the money was. The man looked through Mr. Smith's pockets as the accomplice in the Cadillac told him to shoot Mr. Smith. The man took money and a wallet from Mr. Smith's pants, and then took pieces of his clothing as well. The man also took a work bag from Mr. Smith's car, and was looking through the bag while the driver of the Cadillac stuck the gun in his mouth and threatened to shoot Mr. Smith. After the two men had left, Mr. Smith called the police, looked at photo lineups the police provided, and made identifications of the two men. Mr. Smith identified the defendant in court as one of the persons who robbed him. On cross examination, Mr. Smith testified that the defendant acted on his own, and did not commence the robbery while taking instructions from the driver of the Cadillac.

[8] On March 22, 2011, the State introduced a copy of the defendant's rights of arrestee form into evidence without objection in conjunction with the testimony of John Carroll.

the defendant did not appear to be intoxicated or under the influence of alcohol or drugs at the time. He was certain that the defendant understood his rights. The defendant then gave a recorded statement, which was played for the jury.[9] Lt. Meunier said that, at first, the defendant denied any involvement in the robbery/murder. With respect to the video tape of the shooting from ACE, Lt. Meunier recounted that there was no indication on the tape that Ms. Lee tried to grab the gun or that the defendant tried to assist her after the shooting. He found no validity to defendant's claim that he was forced to commit crimes by the Latin Kings gang or that Rojas held a gun on him in order to force him to commit crimes. In addition, there were no witness statements or evidence to suggest that a second car was following the defendant and Rojas at the time of the crime. Lt. Meunier stated that he had no concerns about defendant's mental state at the time the defendant gave his statements to police.

Dr. Sarah Deland testified at trial for the defense, and was accepted as an expert in forensic psychiatry and addiction medicine. Upon being retained by the defendant in 2009 for an evaluation, Dr. Deland reviewed the defendant's mental health and Social Security records, Jefferson Parish Correctional Center records, records from the forensic hospital in Jackson, a sanity commission report, reports of Dr. Zimmerman, data from Dr. Victoria Swanson, and reports of Dr. Chafetz and Dr. Mallik. Dr. Deland opined that there was evidence of the defendant's mental illness before August 4, 2005. The defendant's Social Security records document a diagnosis of mental retardation and, in 2002, Dr. Richard Richoux diagnosed the defendant with psychotic disorder and mild mental retardation.

Dr. Deland recounted that after the defendant's arrest in 2005, Drs. Richoux and Salcedo found the defendant incompetent to proceed and sent him to a forensic

---

[9] The defendant did not object to copies of the taped interview, or to a transcript of the interview, being admitted into evidence.

hospital in Jackson, Mississippi, for evaluation and competency restoration. However, the defendant was uncooperative in Jackson and evaluators concluded that he was malingering, feigning, or exaggerating memory deficits and psychiatric symptoms. Dr. Deland opined can one can be mentally ill and still exaggerate symptoms. The defendant's medical records show three drug overdoses. In Dr. Deland's opinion, the defendant's IQ score of 66 indicates that he is in the mild mental retardation range and she believed that the defendant met the criteria for being classified as mentally retarded. Dr. Deland had the impression that the defendant was a follower of Rojas, and had received information that the defendant paid Rojas to take him to cash his disability check every month and also bought Rojas alcohol and drugs afterwards. She thought it was possible that the defendant did not know right from wrong at the time of the crimes.

Regarding whether defendant was legally insane at the time of the offense, Dr. Deland thought that it was possible that defendant's mental illness prevented him from knowing the difference between right and wrong at the time of the crime. She was convinced that defendant had a mental illness and several mental disorders, and she believed that they affected his behavior on the day in question and every day; however, she did not find that it rose in severity to the level that she could say with reasonable medical certainty that defendant did not know right from wrong at the time of the offense. Dr. Deland testified that she had a hard time diagnosing defendant, probably for the same reasons the people at "Jackson" had. She also testified that defendant had a disorder that had a mood component and psychotic symptoms.

On cross examination, Dr. Deland admitted that the defendant had told her that Rojas had threatened and forced him to commit the robbery and that he only shot Ms. Lee after she tried to take the gun from him. She could not determine if the defendant is mentally insane, meaning that he could not tell right from wrong.

She also noted that the defendant was not a truthful person. After watching the tape of Ms. Lee's murder, she knows the defendant lied in his account to her of what happened.

At the conclusion of Dr. Deland's testimony, the State called a rebuttal witness, Dr. Harminder Mallik, who was accepted as an expert in the field of forensic psychiatry. The State had retained Dr. Mallik to conduct an independent evaluation of the defendant, which included reviewing medical records dating back to the defendant's childhood as well as all other police reports pertaining to the case. In Dr. Mallik's interview, the defendant admitted to shooting the victim.

Dr. Mallik opined that, to a reasonable degree of medical certainty, although the defendant had been given several psychiatric diagnoses in the past, none of those diagnoses reached the point that it precluded his ability to distinguish between right and wrong at the time of the offense. Dr. Mallik concluded that the defendant was not legally insane.

### The penalty phase of trial

The penalty phase of trial began on March 25, 2011.

Ms. Tina Ledet testified that the defendant robbed her at gunpoint in 2005 in her home driveway while her two children were in the car. She saw the defendant get out of an older model silver Cadillac and walk toward her. When Ms. Ledet tried to hand the defendant her purse, he would not take it; instead, he put a gun to her head and cocked it. The defendant told Ms. Ledet that if she did not want him to kill her in front of her children that she needed to run down the street. Ms. Ledet complied and the defendant ran away as well. Sometime after the robbery, Ms. Ledet saw the defendant's photograph on the news, which prompted her to call the

police. Ms. Ledet identified the defendant in open court as the person who robbed her.[10] [11]

Ms. Hwa Lee's sister, Jamie, testified and described the emotional impact to her family that resulted from her sister's murder.

Prior to the defendant's testimony, defense counsel stipulated that on June 22, 2000, the defendant pled guilty to accessory after the fact to second degree murder. Defendant then took the stand and gave the following statement:

**THE DEFENDANT:**

> Yes. I would like to say that I have no sympathy or empathy for Hwa Lee or her family, I have lost people myself. There's no sense to cry over spilled milk and burned matches and that's exactly what Hwa Lee is to me. I have no conscience so when I go back to the dorm and I lay down, I don't think about it ever. Just by y'all finding me guilty, if I had an AK .47, I'd kill every last one of y'all with no problem or have no remorse for what I have done. Thank you. That concludes my statement.

On cross examination, the defendant asserted that he was not mentally retarded and that he had previously bragged that he knew how to skew the results of the mental tests that had been given to him. The defendant further admitted that as Ms. Ledet was leaving the witness stand, he told her that he should have "blowed her brains out."[12]

Members of the defendant's family testified on his behalf. His sisters Keiwana Wilkinson and Shandria Doyle both gave details about the defendant's childhood and his character. The defendant's mother, Yvette Doyle, gave an

---

[10] Ms. Ledet's minor daughter also testified at trial and corroborated details of the robbery. She identified the defendant in open court as the person who robbed her mother.

[11] The record indicates that after Ms. Ledet's testimony was completed, the defendant said "f**k your brains out." The Judge immediately ordered the jury out of the courtroom and admonished the defendant not to have any more outbursts. The defendant agreed, but defense counsel then stated that the defendant indicated he would continue to be disruptive during the proceedings. Defense counsel suggested removing the defendant from the courtroom. Soon after, the defendant apologized for his behavior.

[12] At the conclusion of the defendant's testimony, defense counsel moved for a mistrial, which was denied by the trial court.

account of the defendant's problems in childhood as well as a history of mental illness in her family.

Dr. Marc Zimmerman, a psychologist and medical psychologist, testified that he conducted a cognitive assessment of the defendant, which included the administration of an intelligence test. Based upon the results of those tests, Dr. Zimmerman concluded that the defendant suffers from mental retardation and brain dysfunction. Dr. Zimmerman recounted that the defendant had been diagnosed with paranoid schizophrenia at age 16 or 17, and with psychosis and mild mental retardation at the age of 19. On cross examination by the State, Dr. Zimmerman admitted that with one exception, he had always testified for the defense in capital cases. He acknowledged reading reports that the defendant was malingering, as well as the defendant's prior statements to doctors that he would "beat the charge by acting up." Dr. Zimmerman opined that it was possible the defendant had deliberately skewed mental tests administered to him.

Dr. Victoria Swanson, a licensed psychologist, testified that she always testified for the defense in capital cases. In this case, she conducted an adaptive evaluation of the defendant to determine mental retardation. Dr. Swanson concluded, based on the results of those tests, that the defendant is mentally retarded. Dr. Swanson conceded the possibility that the defendant could have deliberately given wrong answers on the tests used to evaluate him.

Dr. Michael Chafetz, a clinical psychologist and neuropsychologist, opined that he did not think the defendant was mentally retarded, although he recounted that the defendant was uncooperative during the evaluation. He referred to the defendant's previous diagnoses of depressive order and anxiety disorder, and stated his conclusion that the defendant had a learning disorder and did not suffer from mental retardation.

## ASSIGNMENTS OF ERROR

On appeal, the defense counsel[13] asserts the following assignment of error:

1.  Mr. Doyle's substantive Due Process rights were violated when he was tried while incompetent.
2. Mr. Doyle's procedural Due Process rights were violated when the trial court failed to observe procedures adequate to protect his right not to be tried while incompetent.
3. The district court erred in refusing to permit Mr. Doyle to excuse himself from the courtroom during the trial when suffering the effects of his mental illness.
4. The trial court erred in permitting the State to offer evidence of Mr. Doyle's custodial statements to police, which were involuntary and not pursuant to a knowing voluntary and intelligent rights waiver.
5. The Trial Court erred in prohibiting the defense from relying upon evidence of Mr. Doyle's intellectual disability in the guilt phase of the trial. XIV; La. Const. Art. I, § 2, 16.
6. The trial court erred in forcing Mr. Doyle to trial in violation of his rights to a jury drawn from a fair cross-section venire from which Mr. Doyle's petit jury was drawn did not represent a fair cross section. Amendment VI, XIV; La. Const. Art. I, § 2, 3, 16.
7. The trial court erred in denying Mr. Doyle's motion for new trial based upon new and material evidence of intoxication at the time of the offense.
8. The trial court erred in denying Mr. Doyle's motion for new trial based upon new and material evidence of severe mental illness that would have existed at the time of the offense.

## LAW AND ANALYSIS

## ASSIGNMENTS OF ERROR 1, 2, AND 8.

Defense counsel's first two assignments, as well as the eighth assignment of error, relate to the defendant's competency to stand trial.

*Pretrial competency hearings*

It is clear from the record that the defendant's competency was an issue brought before the court beginning several years prior to trial.  On February 15, 2006, pursuant to the trial court's appointment, the defendant was examined at the Jefferson Parish Correctional Center by Dr. Richard Richoux and Dr. Rafael Salcedo.  In the resulting report dated February 16, 2006, Drs. Richoux and Salcedo opined that the defendant was not cooperative during the examination and

---

[13] Because the defendant was found incompetent to assist counsel on appeal, this opinion will refer to the assignments being raised and argued by defense counsel.

it was apparent that the defendant was "attempting to present himself as a grossly impaired individual." The report further explained that while it was possible that the defendant may have had some degree of cognitive and/or psychiatric impairment, it was "unquestionable that he was exaggerating the same." The possibility of malingering was considered by the doctors during the balance of the examination. Drs. Richoux and Salcedo concluded in their report that, out of an abundance of caution, and given the seriousness of the charges against the defendant, their recommendation was that the defendant be found incompetent to proceed to trial and that he be remanded to the Eastern Louisiana Mental Health System - Forensic Division, to rule out a diagnosis of malingering. On March 8, 2006, the court found the defendant incompetent to stand trial and was he remanded to the Eastern Louisiana Mental Health System-Forensic Division on June 7, 2007.

On March 19, 2008, a second competency hearing was conducted for the defendant. The State entered three reports into evidence without objection. The first report was a Forensic Competency Evaluation and Report dated August 22 and 23, 2007, which was authored by the Louisiana Department of Health and Hospitals. The report indicated that the defendant did not have any psychiatric signs or symptoms while being evaluated which would indicate "a bona fide psychiatric diagnosis." The report also stated that the defendant's interviews were "inconsistent and at times over exaggerated, thus suggesting a strong level of suspicion of malingering." More specifically, the evaluators concluded that the defendant was "attempting to malinger cognitive problems and symptoms of severe mental illness." In addition, the report found that the defendant met the criteria for competency as set forth in *State v. Bennett,* 345 So.2d 1129, 1138 (La. 1977), which outlines the defendant's knowledge of courtroom proceedings and his

ability to assist counsel.[14]  In *State v. Bennett*, the Louisiana Supreme Court set

forth the considerations necessary to determining whether a defendant is fully

aware of the proceedings against him:

> The decision as to a defendant's competency to stand trial
> should not turn solely upon whether he suffers from a mental disease
> or defect, but must be made with specific reference to the nature of the
> charge, the complexity of the case and the gravity of the decisions
> with which he is faced. See, Note, 6 Loyola Univ.L.J. at 684; Note, 4
> Columb.Hum.Rights L.Rev. at 245; See also, *United States v.
> Masthers*, 176 U.S.App.D.C. 242, 539 F.2d 721 (1976). Appropriate
> considerations in determining whether the accused is fully aware of
> the nature of the proceedings include: whether he understands the
> nature of the charge and can appreciate its seriousness; whether he
> understands what defenses are available; whether he can distinguish a
> guilty plea from a not guilty plea and understand the consequences of
> each; whether he has an awareness of his legal rights; and whether he
> understands the range of possible verdicts and the consequences of
> conviction. Facts to consider in determining an accused's ability to
> assist in his defense include: whether he is able to recall and relate
> facts pertaining to his actions and whereabouts at certain times;
> whether he is able to assist counsel in locating and examining relevant
> witnesses; whether he is able to maintain a consistent defense;
> whether he is able to listen to the testimony of witnesses and inform
> his lawyer of any distortions or misstatements; whether he has the
> ability to make simple decisions in response to well-explained
> alternatives; whether, if necessary to defense strategy, he is capable of
> testifying in his own defense; and to what extent, if any, his mental
> condition is apt to deteriorate under the stress of trial.

A second report offered by the State at the competency hearing was

identified as a Psychological Consultation written by Dr. Craig Waggoner, Ph.D.,

M.P. Dr. Waggoner explained in the report that the defendant was referred to him

for evaluation "to rule out malingering of cognitive problems and psychiatric

symptoms."  The evaluation consisted of both a records review[15] and an interview

---

[14] In the comments section for that portion of the report, it was stated:

> While the patient did not cooperate fully with the examination to answer all of
> the questions, we believe that he does understand his legal rights properly.  As stated
> before, the patient appears to be malingering in order to avoid looking like he does know
> and understand his legal rights and based on the evidence that we have, we believe that
> he does.

[15] Dr. Waggoner noted in his report:

> [The defendant's] knowledge of the legal system is noted to fluctuate from week
> to week, first giving "nonsensical" responses to questions, then being able to give correct
> responses, followed by an inability to give correct responses. One note by the security

with the defendant. In his conclusions, Dr. Waggoner noted that the testing results confirmed the concerns raised by the Sanity Commission that the defendant "may be feigning cognitive problems and symptoms of severe mental illness." He also stated that behavioral observations and interview information obtained from the defendant have also revealed that the defendant's "behaviors and self-report are inconsistent across settings and across staff… In addition, gross inconsistencies in his fund of knowledge, and in his behavior and performance in group activities, are indicative of a conscious attempt, on the part of the patient, to feign impaired intellectual functioning. and impaired memory abilities." Dr. Waggoner also concluded that "a preponderance of evidence from direct observation, observations by other professional staff, the [defendant's] history, the [defendant's] self-report information, and numerous objective tests, indicates that [the defendant] is attempting to malinger cognitive problems and symptoms of severe mental illness."

A third report, from Drs. Richoux and Salcedo, dated September 19, 2007, indicated that they conducted a "follow-up evaluation" in order to determine if the defendant suffered from a mental disorder "affecting his ability to meet the *Bennett* criteria for competency to proceed to trial." The doctors observed the same behavior that they had last seen from the defendant in 2006, which was "fraught with contradictions, and strongly indicative of a purposeful effort to appear both psychiatrically and cognitively impaired." Drs. Richoux and Salcedo concluded that the defendant "did not show any signs or symptoms of suffering from a psychiatric disorder" and "there would appear to be no reason why [the defendant] would be unable to understand the nature of the charges or the proceedings against him." The report further concluded that there was no psychiatric reason why the

---

staff states, "Security staff reports patient saying this morning (to another patient) 'I'm going to beat this charge."'

defendant would be unable to assist his attorney in preparing his defense if he chose to do so.

At the conclusion of the March 19, 2008 competency hearing, the trial court found that the defendant was found competent to stand trial. As detailed above, there was a consensus among the defendant's evaluators, which was presented to the trial court, that the defendant was deliberately malingering his symptoms.

***Competency hearings on the eve of trial***

The issue of the defendant's competency was next raised by defense counsel on March 11, 2011, three days before trial was scheduled to begin. In a motion for psychiatric evaluation, defense counsel alleged that the defendant's "mental condition is deteriorating to the point where he is not able to assist counsel." Counsel also asserted that in visits to the defendant over the prior two weeks, the defendant was "unable to engage in meaningful conversation about his case." The defendant's motion was granted, and Drs. Richoux and Salcedo were appointed to conduct the mental examination of the defendant, which was completed on March 14, 2011.

On March 14, 2011, the court held a hearing on the defendant's motion. Dr. Salcedo was the first to testify. He acknowledged that the purpose of the examination was determine if the defendant had a psychiatric disorder.[16] Dr. Salcedo recounted that he and Dr. Richoux had evaluated the defendant on two prior occasions, in 2006 and again in 2007. Dr. Salcedo commented that, unlike in the two previous evaluations, the defendant was "more cooperative" and was able to demonstrate a "clear understanding of the charges he faces," "a clear understanding of the proceedings against him," as well as the role of the various courtroom participants, his legal rights, possible pleas he could enter, and the

_____

[16] Dr. Salcedo defined the term "psychiatric disorder" as "a mental disease or defect which, in turn, would impair [the defendant's] ability to understand the *Bennett* criteria, specifically to understand the proceedings against him, the charges against him, and to evaluate his ability to assist counsel."

consequences of various trial outcomes. When asked if he had ever previously found the defendant incompetent to stand trial, Dr. Salcedo explained that he and Dr. Richoux had previously suggested to the court that, out of an abundance of caution, the defendant should be found incompetent so that he could undergo further testing to determine if he was malingering.[17] In conclusion, Dr. Salcedo concluded that the defendant presently met the *Bennett* criteria and was competent to proceed to trial. On cross examination, Dr. Salcedo indicated that he had not treated the defendant outside of the three evaluations.

Dr. Richoux gave the opinion in his testimony that, after his recent evaluation of the defendant, he believed that the defendant understood the proceedings and was capable of assisting counsel in his defense. It was Dr. Richoux's recommendation that the defendant be found competent to proceed to trial. On cross examination, Dr. Richoux revealed that he had previously evaluated the defendant approximately "75-100 times" since the time of his arrest for first degree murder. He, himself, had prescribed the psychiatric medications that the defendant had taken over the course of years through the time of trial. The most recent medication, which Dr. Richoux had prescribed to the defendant approximately two months before trial, was given to address the defendant's anxiety over the legal proceedings. On re-direct examination, Dr. Richoux testified that the defendant had not complained of hallucinations "in a very long time."

The defendant submitted his motion on the basis of the doctors' testimony and did not call any additional witnesses, nor did he introduce any medical evidence. At the conclusion of the hearing, the court found the defendant competent to stand trial over counsel's objection.

---

[17] Dr. Salcedo defined the term "malingering" as "the voluntary production of false psychiatric symptoms for an understandable goal that the person has in doing so."

Constitutional due process requires that the trial of an accused be conducted only when he is legally competent. *Bishop v. United States*, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956); *State v. Nomey*, 613 So.2d 157 (La. 1993). Mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense. La. C.Cr.P. art. 641. A defendant's mental incapacity to proceed may be raised by the defense, the district attorney, or the court at any time. La. C.Cr.P. art. 642, *State v. Williams*, 02-1016 (La. App. 5 Cir. 2/25/03), 841 So.2d 936, 942, *writ denied*, 03-2205 (La. 8/20/04), 882 So.2d 571.

There is a presumption of capacity to proceed. *State v. Payne*, 586 So.2d 652, 654 (La. Ct. App. 5 Cir. 1991). The defendant bears the burden of proving by a preponderance of the evidence his incapacity to stand trial and a trial court's determination is reviewed under an abuse of discretion standard. *State v. Rochon*, 393 So.2d 1224, 1228 (La. 1981), *State v. Pollard*, 12-346 (La. App. 5 Cir. 12/18/12), 106 So.3d 1194, 1198, *writ denied*, 13-140 (La. 6/21/13), 118 So.3d 408. In the instant case, the defendant offered no medical evidence or testimony at the March 14, 2011 hearing to suggest he was incompetent to proceed to trial. To the contrary, the trial court had before it the report and testimony of a psychiatrist and a clinical psychologist who had evaluated the defendant the same date of the hearing and opined that the defendant met all of the *Bennett* criteria. The trial court was also familiar with various prior medical opinions and reports from the previous Sanity Commissions that the defendant was malingering to avoid facing serious consequences.[18] In summary, given the presumption of sanity, the trial court's familiarity with the defendant's prior evaluations for competency, and the

---

[18] It is permissible for a court to use evidence of malingering as a factor to find a defendant competent to stand trial. *See*, *State v. Bryant*, 52,743 (La. App. 2 Cir. 6/26/19), 277 So.3d 874, 881, *writ denied*, 19-1320 (La. 10/8/19), 280 So.3d 171; *State v. Boys*, 19-0675 (La. App. 4 Cir. 5/26/21), 321 So.3d 1087.

trial judge's chances to observe defendant personally,[19] we conclude that the defendant has failed to demonstrate the trial judge abused her discretion in finding him competent to proceed to trial.

***Alleged competency issues during voir dire and guilt phase of trial***

Next, defense counsel contends that the defendant demonstrated signs of "mental deterioration and incompetence" during *voir dire* and the guilt phase of trial. Specifically, appellate counsel relies upon the affidavits of trial counsel, written and submitted to the trial court as part of a motion for new trial, which indicated that the defendant's attorneys observed that he was sleeping during trial,[20] demonstrated "psychological symptoms," could not control his "prejudicial behavior" and was generally disruptive.

---

[19] For example, on December 14, 2009, the defendant made a *pro se* motion for substitution of counsel in which he argued that certain rights had been waived without his consent, and that there was a difference of opinion between himself and defense counsel on whether the defendant could plead guilty by reason of insanity. Defendant clearly indicated that he understood the seriousness of the charges against him and that he faced the possibility of the death penalty if convicted. He argued in support of his motion "…[M]y basic Constitutional rights say that I have the right to have effective counsel assistance… And at this moment, I would like to withdraw the plea of not guilty and enter a plea of not guilty and not guilty by reason of insanity due to the fact that I am representing myself." Prior to allowing the defendant to represent himself, the trial court ensured that he understood the dangers and disadvantages of self-representation and that he had "capacity," was literate, and "competent" to make the choice. The defendant was able to inform the court of the medications he was taking, the purpose of each medication as well as who had prescribed the medications for him. He informed the Court of the books he had read throughout his life, and efforts to educate himself. He gave a chronological history of institutions he had gone to for mental health treatment. The defendant indicated that he had prior interaction with the criminal justice system after being accused of second degree murder and theft. He correctly informed the court that he was presently charged with first degree murder, for which the State was seeking the death penalty, as well as an armed robbery charge. He also correctly stated the two possible penalties for first degree murder as "[l]ife or death." The defendant was able to clarify different grades of his armed robbery charges, designating that one was "attempt" and that another robbery was used as an aggravating circumstance for the first degree murder charge. He understood that he had the constitutional right to appointed counsel, and he also indicated an understanding of the court's opinion that self-representation was an unwise decision. He affirmed his understanding that he would be held to the same standards of an attorney at trial. The defendant understood very clearly the trial court's instruction that "no misbehavior or trial disruptions will be tolerated." At the conclusion of the hearing the trial court accepted the defendant's motion as "knowingly, intelligently and voluntarily made." At the conclusion of the hearing, the defendant indicated that he wanted to formally withdraw his former plea of not guilty and enter a new plea of not guilty by reason of insanity.

[20] At least one instance of the defendant's drowsiness, during pre-trial proceedings, is indicated to have occurred. On June 5, 2009, defense counsel advised the court that the defendant was "heavily medicated" and maybe not capable of understanding the proceedings. The Judge made a point of noting on the record that the defendant had walked into court on his own, and "[h]e was alert because he made a lot of noise during my civil hearing that I had before this hearing." Counsel objected that the defendant was "leaning over." The judge then put on the record that she personally saw and heard defendant "having a coherent conversation" with his lawyer." The judge finally commented that the case had been continued a number of times "because of the shenanigans that Mr. Doyle has engaged in."

After the commencement of the guilt phase of trial, defense counsel did not move expressly for the appointment of another sanity commission under La. C.Cr.P. art. 644(A).[21] *See*, *State v. Carmouche*, 01-405 (La. 5/14/02), 872 So.2d 1020, 1042, *on reh'g* (Sept. 25, 2003). Nevertheless, La. C.Cr.P. art. 643 provides that a court shall order a mental examination of a defendant and accordingly appoint a sanity commission when it "has reasonable ground to doubt the defendant's mental capacity to proceed." La. C.Cr.P. art. 643. Reasonable ground in this context refers to information which, objectively considered, should reasonably raise a doubt about the defendant's competency and alert the court to the possibility that the defendant can neither understand the proceedings, appreciate the proceedings' significance, nor rationally aid his attorney in his defense. *State v. Snyder*, 98-1078 (La. 4/14/99), 750 So.2d 832, 851 (quoting *Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir. 1980)). Thus, the question to be answered in the instant case is whether the trial court had information before it that should have put the defendant's competency at issue after trial had commenced, sufficient to have the defendant's competency re-evaluated.

The record is silent as to whether, or to what degree, the trial judge personally observed any of the complained of behaviors specifically alleged in the affidavits by defense counsel which reportedly occurred during trial. The record does show, however, that the defendant was disruptive at various stages throughout the proceedings,[22] and that he was admonished by the trial judge at those times, eventually being shackled as a result of his behavior. Under *Snyder*, *supra*, our

---

[21] Even if specifically requested, simply because a defendant's capacity to proceed is called into question by formal motion does not mandate a mental examination be ordered and a sanity commission be appointed. La. C.Cr.P. arts. 643, 644; *State v. Goins*, 568 So.2d 231, 234 (La. App. 3d Cir. 1990), *writ denied*, 573 So.2d 1117, 1118 (La. 1991). Appointing a sanity commission is neither a perfunctory matter nor a ministerial duty of the trial court; it is not guaranteed to every accused in every case. *State v. Lott*, 574 So.2d 417, 424 (La. App. 2d Cir. 1/23/91), *writ denied*, 580 So.2d 666 (La. 1991).

[22] Examples of this behavior included the defendant speaking to an excused juror, as well as another outburst during *voir dire*.

review must answer whether these incidents evidenced that the defendant neither understood or appreciated the significance of the proceedings, and if he could rationally aid his attorney in his defense.

As noted previously, the trial court had been presented medical evidence on the eve of trial to establish the defendant's competence. The trial court was also aware of the concurring medical opinions that the defendant had been malingering his symptoms in order to appear incompetent. Against this background, the trial judge had a basis to consider the defendant's conduct at trial that she personally observed, as the behavior was happening. Our state's case law is replete with examples of criminal defendants who were "outrageously" disruptive during their respective trials and other proceedings, while under the legal presumption of competence.[23] In this case, we cannot say that the record itself demonstrates that defendant's conduct during *voir dire* and the guilt phase of his trial, without more, should have reasonably indicated to the trial judge that he was incompetent. Our review of the pre-trial record shows the defendant was disruptive prior to trial on several occasions, including behavior for which the trial court found the defendant to be in contempt.[24]

The record also evidences that the defendant made decisions during the guilt phase of trial to assist in his own defense. In one such instance, defense counsel indicated that the defendant wished to absent himself from a portion of the

---

[23] A brief recounting of examples of this type of behavior was noted by the supreme court in *State v. Langley*, 95-1489 (La. 4/14/98), 711 So.2d 651, 668, *on reh'g in part* (June 19, 1998):

> …Langley's behavior was not as outrageous as that shown in *Allen* (defendant threatened the judge and tore up and threw around papers), or in two leading Louisiana cases, *State v. Riles*, 355 So.2d 1312 (La.1978) (defendant argued with judge and scuffled with sheriffs) or *State v. Lee*, 395 So.2d 700 (La.1981) (defendant sang the Star Spangled Banner and quoted scripture aloud during proceedings).

[24] In this case, the defendant had previously been disruptive to the point of contempt for which he was found guilty and sentenced on December 17, 2009, to six months for disruption of court. The record also reflects other miscellaneous disruptions by the defendant which occurred during pre-trial proceedings held on March 19, 2008, and August 14, 2009.

guilt phase of the proceedings, in part, to avoid the possibility he would make any prejudicial outbursts. The trial court asked the defendant if he agreed with this decision and he answered that he did. After that, the defendant made statements to the trial judge and she admonished him to remain silent. The judge then asked the defendant if he wanted to meet privately with his attorneys outside the courtroom and he answered affirmatively.

In another instance, the court questioned the defendant directly about whether he wanted to waive his right to testify in the guilt phase of his trial.

**THE COURT:**

Alright, Mr. Doyle, it is my understanding that, at this time, in this phase of your trial, you have decided that you do not want to testify. Is that correct?

**THE DEFENDANT:**

Yes. My attorney think [sic] that'll be best, so I'm not going to testify.

**THE COURT:**

Is that your decision, Mr. Doyle?

**THE DEFENDANT:**

Yes, it's my decision.

In summary, we find that the record supports the trial court's conclusion that the defendant was competent to proceed to the penalty phase of his trial.

The appeal before us presents a unique procedural posture. As noted, we conclude that the defendant was competent to proceed to the guilt phase of trial. We also conclude that the State presented sufficient evidence upon which the jury could convict the defendant of first degree murder. During trial, the State met its burden of establishing all of the elements required to prove the defendant committed the first degree murder of Hwa Lee while engaged in the act of armed

robbery.[25] Accordingly, La. R.S. 14:30(C)(1) applied to the sentencing phase of trial: "If the district attorney seeks a capital verdict, the offender shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, in accordance with the determination of the jury." Here, while the jury sentenced the defendant to death, that sentence has been vacated and a life sentence has been imposed. It follows then, that any considerations the jury may have had in making their determination to impose the death penalty are now moot and/or irrelevant. This, in our opinion, applies to any acts by the defendant himself during the penalty phase of trial which the defendant now claims are prejudicial. *See*, for example, *State v. Shank*, 448 So.2d 654 (La. 1984), in which the Louisiana Supreme Court found that a defendant on trial for first degree murder, who told the jurors that he would kill them if he escaped, did not suffer prejudice from his own behavior when he was not sentenced to death:

> Defendant was on trial for first degree murder. He faced the possibility of the jury recommending that he be sentenced to death. He threatened the jury that if only sentenced to life imprisonment he would have the rest of his life to escape, and that if he did so he would kill each one of them. Notwithstanding these threats, which defense counsel argues prejudiced the jury against him, the jury did not return the recommendation that defendant be executed. Instead, the life imprisonment sentence was recommended. Thus the prejudice in the jurors' minds, that defense counsel argues tainted his client's trial with reversible error, does not readily appear.

*Id*. at 658.

Nevertheless, we will review this assignment error, focusing on the issue of the defendant's competency to proceed at the time of the penalty phase of trial.

---

[25] Specifically, the evidence at trial, which included both a video of the defendant committing the armed robbery and fatally shooting Hwa Lee, as well as the defendant's own confession, demonstrated that the State proved that the defendant violated La. R.S. 14:30(A)(1), which provides in part:

> A. First degree murder is the killing of a human being:
>     (1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of … armed robbery…

As with the defendant's other allegations that he showed signs of a deteriorating competence during trial, which rely heavily on trial counsel's affidavits, the record itself shows no indication that the defense sought to convene a sanity commission during the penalty phase of trial. Therefore, our review consists of a determination on whether the trial judge had objective evidence before her that would warrant a challenge to the legal presumption of sanity, which was established by medical evidence on the eve of trial.

The penalty phase of trial began the day after the defendant was found guilty of first degree murder. Our review of the transcript from those proceedings reveals several interactions that were directly between the trial court and the defendant, as well as acts by the defendant of which the trial court was made aware. Before the penalty phase commenced on March 25, 2011, the trial judge, the State, and defense counsel reviewed the proposed verdict sheet and jury instructions to ensure that there was a consensus. While the issue of a charge for mental retardation was being discussed, the defendant stated, "I ain't [sic] retarded." He was admonished by the trial judge to remain quiet. Shortly thereafter, the defendant said, "I'm tired of people saying that [that the defendant is retarded]. That's why I want to take the stand." The defendant also made similar comments in open court during the guilt phase of trial to the effect that he was not mentally retarded. Other incidents involving the defendant at the penalty phase of trial included defense counsel asking that the defendant be removed from the courtroom after advising the court that the defendant had indicated he would be disruptive throughout the proceedings that day. In another instance, one the defendant's attorneys indicated to the court that the defendant was acting aggressively toward her and that she feared for her safety. Counsel also informed the court that the defendant had disorganized some medical records the defense intended to offer as an exhibit.

Defense counsel informed the court early in the penalty phase proceedings that the defendant indicated that he wished to testify. Counsel later offered a clarifying comment about the defendant's desire to testify:

**DEFENSE COUNSEL:**

> Your Honor, it is my understanding at this point that Mr. Doyle, when we get to our case, intends to take the stand. I just wanted to make a record of the fact that we have advised him that we don't think that's a good idea. We have tried, in this case, several times to let the court know that we have questions about his competency. We still have questions about his competency. I think that may become clear when he takes the stand today, but I just want it to be clear that it is not our decision, but we are ethically bound to put Mr. Doyle on the stand if that is his decision and that appears to be his decision at the moment.

Prior to the defendant taking the stand, defense counsel advised the jury of the possibility that the defendant could make inappropriate remarks during his testimony, but argued that this only evidenced behavior that showed how different defendant was:

**DEFENSE COUNSEL:**

> I suspect that later this morning, you may hear from Isaiah himself. It is his right to testify and he can choose to exercise that right even if he's not the smartest witness or the most eloquent witness. As you are listening to Isaiah, I ask you to please keep in mind that Isaiah has difficulty processing information and that he is probably struggling to process your verdict from yesterday. When Isaiah struggles to process information, as Dr.

DeLand told you, he sometimes reacts in ways that the
rest of us would not consider appropriate.

Defense counsel later used the defendant's own testimony as evidence of mental instability. Specifically, Dr. Zimmerman was asked on the stand whether the defendant's act of testifying was an example of "poor adaptive functioning" and was also consistent with someone who has "mental illness" and "mental retardation," to which he replied that the defendant's testimony displayed all of these classifications.

After the defense had rested for the penalty phase of trial, defense counsel then verbally moved for a mistrial, which was denied by the trial court:

**DEFENSE COUNSEL:**

For the defense, we would
move for a mistrial. The basis for the mistrial is
that the jurors, because of the testimony of Isaiah
Doyle, are now unable to fairly consider this case and
present a fair verdict. We think it is a violation of
the federal fifth, sixth and eighth amendment
violations [sic] and it involves the right to remain silent,
the right to counsel, the right to a fair trial and
the prohibition against cruel and unusual punishment.
Essentially, we believe that he should not have been
allowed to testify over counsel's objection because he
is mentally ill and because he is mentally retarded
and cannot make a reasoned and valid decision about
that most important part of a trial.

After reviewing the record, we find no error in the trial court's denial of the defendant's motion for a mistrial based upon his testimony. A defendant cannot successfully maintain that prejudice resulting from his own inappropriate behavior mandates a mistrial or a new trial. *State v. Shank, supra*; *State v. Wiggins*, 337 So.2d 1172 (La. 1976); *State v. Tyler*, 607 So.2d 910 (La. App. 2d Cir. 1992), *writ*

*denied*, 612 So.2d 97 (La. 1993); *State v. Lucas*, 482 So.2d 7 (La. App. 1st Cir. 1985). To afford a defendant such relief, based on his own conduct, would obviously provide a means by which he could forever effectively prevent a final determination of his guilt. *State v. Shank*, *supra*.

### A defendant's right to testify

As recognized by both the federal and state constitution, a criminal defendant's right to testify is fundamental. Specifically, the state constitution provides in pertinent part: "[a]n accused is entitled to confront and cross-examine the witnesses against him, to compel the attendance of witnesses, to present a defense, and to testify in his own behalf." La. Const. art. I § 16. Both state and federal jurisprudence recognize that "a criminal defendant's right to testify is fundamental and personal to the defendant" and the decision to "testify in one's own behalf" is "ultimately a decision for the accused to make." *State v. Hampton*, 00-522 (La. 3/22/02), 818 So.2d 720, 723, *on reh'g in part* (6/7/02). The U.S. Supreme Court has been "unequivocal" in holding that the U.S. Fifth, Sixth and Fourteenth Amendments guarantee a defendant's right to testify. *Hampton*, *supra* (*citing Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)).

The entirety of the defendant's testimony during the penalty phase of trial was previously provided above. While the defendant's words speak for themselves, several things are clear. The defendant admitted to murdering Hwa Lee and claimed no remorse for his act. The defendant also made clear that he both understood and was angry about the jury's guilty verdict the day before and he wished them harm as a result. However, at the time of his testimony, the defendant had already been convicted of murdering Hwa Lee, so his guilt was no longer an issue. Other evidence before the jury, besides his own testimony, indicated that the

defendant had no remorse for murdering Ms. Lee.[26] Thus, these statements by the defendant were either previously known to the jury or cumulative of other evidence that would be presented during the hearing.[27]

Finally, in exercising his constitutional right to testify, the defendant made a threat to the jury that was argued by defense counsel to indicate his mental deficiencies. Any prejudice that the defendant may possibly have suffered as a result of the threat was removed by virtue of the fact that the jury's death penalty was vacated and the defendant was instead re-sentenced to life in prison. In looking at the entirety of the record, which includes substantial evidence that defendant was feigning or malingering symptoms of mental illness, it cannot be ruled out that the defendant used his statement to the jury for his own calculated ends. Similar to the supreme court's observations in *State v. Shank*, *supra*, the "defendant's outbursts may have been motivated by a belief that he could convince the jury that he was insane, thus securing the latter verdict, or alternatively that he

---

[26] The record shows the trial court found admissible, in the penalty phase of trial, the defendant's statement to State's witness, Dr. Chafetz, "I have no remorse." The trial court also allowed in other statements by the defendant to Dr. Chafetz, including that he was not afraid of life in prison or even death row but that he was afraid of not being able to kill more people. In arguing to exclude the statements, defense counsel attempted to provide a context for why the defendant may have said those things:

> **DEFENSE COUNSEL:**
>
> Again, Mr. Doyle made these statements, he was obviously angry. He was angry with his lawyers, he was angry with the process because we were trying to get him to take a life plea. He was shooting off his mouth, he was saying things that he'd never said to anyone before.
>
> Again, these are things that are not consistent with anything he'd ever said before. He was running his mouth, perhaps trying to get the death penalty at the time thinking that that's what he wanted.

[27] Evidence that a capital defendant shows lack of remorse is "relevant to the character and propensities of the defendant." *State v. Wilson*, 467 So.2d 503, 523 (La.1985) (*citing State v. Summit*, 454 So.2d 1100, 1108 (La.1984), *rev'd on other grounds, Summit v. Blackburn*, 795 F.2d 1237 (5th Cir.1986)); *State v. Juniors*, 03-2425 (La. 6/29/05), 915 So.2d 291, 336. The supreme court has further found that "Such matters as an expression of penitence or of concern for the magnitude of the harm are within the scope of the focus on the character and propensities of the accused. La.C.Cr.P. Art. 905.1." *State v. Summit*, *supra*, at 1108.

could convince the jury to spare his life. It did not go unnoticed that defendant's outbursts seemed quite timely and pointed."

## *Evidence of incapacity presented in a new trial motion (Assignment of error 8)*

As indicated above, in his second motion for a new trial filed on March 28, 2012, the defendant contended that newly discovered post-trial evidence attained through his treatment by the Department of Corrections confirmed the existence of a severe, lifelong psychotic illness—schizoaffective disorder. To establish the basis for a new trial, the defendant relied upon the March 26, 2012 affidavit of Dr. Xavier Amador, a clinical psychologist. Dr. Amador concluded, in summary, that there was ample evidence of a chronic, lifelong, and serious mental illness that operated at the time of trial and rendered defendant incompetent to be tried.[28]

First, the record reflects that the defendant's diagnosis of schizoaffective disorder was not newly discovered evidence, as required under La. C.Cr.P. art. 851(B)(3).[29] In considering the defendant's motion for a new trial on this basis, the trial court correctly noted that evidence the defendant had a lifelong mental illness was already admitted at trial and heard by the jury and, therefore, the additional information was unlikely to change the jury's verdict.[30] After reviewing the

---

[28] Dr. Amador's retroactive determination of the defendant's incompetency stands in contrast to Dr. Richoux's statement in a July 24, 2011 affidavit, also offered as an exhibit to the defendant's new trial motion, that it was not possible to render an opinion on defendant's competence at the time of trial retrospectively because the conditions of trial could not be recreated.

[29] That provision states, in relevant part:

> B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:
>
> > (3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.

[30] As detailed above, Dr. Deland, the defendant's expert forensic psychiatrist, provided a medical history of the defendant at the penalty portion of trial from the time he was an infant through the time of trial. She concluded that there was evidence prior to August 4, 2005, the date of the incident, that the defendant suffered from mental illness and mental retardation. Dr. Deland testified that the defendant suffered from a mental disorder that had a mood component and psychotic symptoms. Dr. Deland further opined at trial that the defendant either had bipolar disorder with mood swings and psychotic symptoms;

evidence supplied by the defendant, we cannot say that the trial court erred in its denial of the defendant's new trial motion on this basis.

## ASSIGMENT OF ERROR 3

In this assignment, defense counsel argues that the trial court erred by refusing the defendant's multiple requests to excuse himself from the courtroom during the trial. Counsel contends that the record indicates that the trial court denied his requests because it thought that capital defendants could not waive their presence.

At the time of trial in 2011, La. C.Cr.P. art. 832 provided in pertinent part:

> A. A defendant initially present for the commencement of trial shall not prevent the further progress of the trial, including the return of the verdict, and shall be considered to have waived his right to be present if his counsel is present or if the right to counsel has been waived and:
>
> (1) He voluntarily absents himself after the trial has commenced, whether or not he has been informed by the court of his obligation to be present during the trial[.]

In the comments to the 1997 amendments to Article 832, the Louisiana Legislature stated, "See also C.Cr.P. Art. 832, which prior to this amendment, dealt only with "temporary" and "voluntary" absences and does not even permit "temporary" and "voluntary" absences in capital cases. The revision contains no such limitation and applies to both capital and non-capital cases."

In *State v. McCoy*, 14-1449 (La. 10/19/16), 218 So.3d 535, *reversed and remanded on other grounds*, - - U.S. - - , 138 S.Ct. 1500, 200 L.Ed.2d 821 (2018), the defendant argued that under La. C.Cr.P. art. 832, he had a legal right to voluntarily absent himself from the proceedings and that the trial court erred as a matter of law by denying him that right. He contended that he was prejudiced by

---

major depression with psychotic features; or possibly a schizoaffective disorder, which was similar to bipolar disorder with more prominent psychotic symptoms.

being forced to remain in the courtroom during his trial after he requested to be allowed to excuse himself from the proceedings. The Louisiana Supreme Court observed that the defendant seemingly orchestrated outbursts for effect during his capital trial. The outbursts included talking to an audience member, challenging a witness, and speaking during the opening statement. It found that the trial court's denial of the defendant's request to excuse himself from proceedings at his capital murder trial did not violate his due process rights. The supreme court further found that even though the defendant sought to voluntarily remove himself from the courtroom, the trial judge exercised the utmost restraint in responding to his disruptive behavior, and given that the jurors were judging the defendant in life or death matters, the trial court implicitly recognized that the jury had a right to observe the conduct and demeanor of the defendant during the trial as he faced the evidence of his crimes. *Id.* at 604-07.

In the instant case, the record does appear to indicate that the trial judge may have erroneously concluded that the defendant could not voluntarily absent himself from trial. However, we find no error in the denial of the defendant's requests to excuse himself from trial. The trial judge clearly believed that the defendant should be present at a trial he asked for. Also, the record indicates that the trial court used restraint in responding to the defendant's behavior by admonishing him and by ensuring that security measures were in place. As in *McCoy*, we conclude that the trial judge implicitly recognized that the jury had the right to observe the defendant's conduct and demeanor at trial and that the defendant's due process rights were not violated.

**ASSIGNMENT OF ERROR 4**

In his fourth assignment, defense counsel argues that the trial court erred in denying the defendant's motion to suppress his statements as they were not

knowingly, intelligently, and voluntarily made because of his mental illness, low IQ, and drug intoxication that were present at the time the statements were made.

A defendant is limited, on appeal, to the grounds he articulated at trial; a new basis for the claim, even if it would be meritorious, cannot be raised for the first time on appeal. *See, State v. Jackson*, 04-1388 (La. App. 5 Cir. 5/31/05), 904 So.2d 907, 911, *writ denied*, 05-1740 (La. 2/10/06), 924 So.2d 162. In the instant case, since the defendant did not present specific arguments about mental illness or low IQ in a written motion to suppress or at the suppression hearing, we accordingly find that he is now precluded from raising these new bases for suppression of his statements for the first time on appeal. However, the defendant did argue drug intoxication as a ground for quashing his confession.

The State has the burden of proving the admissibility of a purported confession or statement by the defendant. La. C.Cr.P. art. 703(D); *State v. Arias-Chavarria*, 10-116 (La. App. 5 Cir. 9/28/10), 49 So.3d 426, 433, *writ denied*, 10-2432 (La. 2/25/11), 58 So.3d 460. Before an inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove beyond a reasonable doubt that the defendant was first advised of his *Miranda* rights,[31] that he voluntarily and intelligently waived his *Miranda* rights, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducements or promises. *Id.; State v. Sierra*, 11-161 (La. App. 5 Cir. 12/28/11), 83 So.3d 239, 248. A determination of voluntariness is made on a case-by-case basis, depending on the totality of the facts and circumstances of each situation. *State v. Gross*, 12-73 (La. App. 5 Cir. 2/21/13), 110 So.3d 1173, 1185, *writ denied*, 13-661 (La. 10/25/13), 124 So.3d 1091.

_____

[31] *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

As the Louisiana Supreme Court observed in *State v. Robinson*, 384 So.2d 332, 335 (La. 1980):

> Where the free and voluntary nature of a confession is challenged on the ground that the accused was intoxicated at the time of interrogation, the confession will be rendered inadmissible only when the intoxication is of such a degree as to negate defendant's comprehension and to render him unconscious of the consequences of what he is saying. Whether intoxication exists and is of a degree sufficient to vitiate the voluntariness of the confession are questions of fact. *State v. Rankin*, 357 So.2d 803 (La. 1978). The admissibility of a confession is in the first instance a question for the trial judge. His conclusions on the credibility and weight of the testimony relating to the voluntariness of a confession will not be overturned unless they are not supported by the evidence. *State v. Hutto*, 349 So.2d 318 (La. 1977).

On June 5, July 31, and August 24, 2009, suppression hearings were held.

At the hearing on June 5, 2009, Lieutenant Meunier testified that he advised the defendant of his rights utilizing a JPSO rights of arrestee form, which he completed on August 4, 2005, at 10:07 a.m. Lieutenant Meunier thought that, at the time, the defendant was "competent," able to communicate with him, and understood his rights. Sergeant Carroll asserted that the statement concluded at 2:47 p.m. He testified that during the interview, the defendant positively identified a still photograph of himself taken from video surveillance of one of the robberies. Sergeant Carroll testified that during Rojas' statement, Rojas indicated that the defendant was an addict who was "high on heroin." The defendant called Detective Roger Gorumba as a witness at the suppression hearing; however, he gave no testimony relative to the defendant's statements to police. Deputy Arnaud testified at the suppression hearing that she assisted Deputy Burgess after he stopped the two suspects. She further testified that she found it necessary to call EMS because the defendant was sweating "profusely" and because she thought the defendant "may have taken something." She also noted that the defendant was "kind of like seizing a little bit." Deputy Arnaud remembered telling EMS that the defendant

appeared to be intoxicated or on narcotics. Deputy Craig Adams testified at the suppression hearing that he was present when EMS arrived and that EMS subsequently advised that both subjects were fine.

Testimony of the interviewing police officer alone may be sufficient proof that a defendant's statements were freely and voluntarily given. *State v. Estes*, 14-781 (La. App. 5 Cir. 2/25/15), 168 So.3d 847, 860, *writ denied*, 15-654 (La. 2/5/16), 186 So.3d 1164. Additionally, in determining whether the trial court's ruling on a defendant's motion to suppress is correct, an appellate court is not limited to the evidence adduced at the suppression hearing but may also consider the evidence presented at trial. *State v. Berroa-Reyes*, 12-581 (La. App. 5 Cir. 1/30/13), 109 So.3d 487, 495. In the instant case, trial testimony reflects that Lieutenant Meunier advised defendant of his rights, after which defendant indicated that he understood them and waived them prior to giving his first statement. Lieutenant Meunier testified that he did not believe that the defendant was intoxicated or under the influence of drugs at the time of the statement. Mr. Carroll also testified that the defendant indicated that he understood his rights and that he waived them prior to giving his second statement. Mr. Carroll did not believe that the defendant was under the influence of drugs or alcohol at the time of his statement. Although Rojas told Mr. Carroll that defendant was under the influence of narcotics and Deputy Arnaud suspected the defendant might be under the influence of narcotics, EMS cleared the defendant after an exam.

As the supreme court noted in *State v. Manning*, 03-1982 (La. 10/19/04), 885 So.2d 1044, 1074, *cert. denied*, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005), "the mere fact of drug or alcohol intoxication is insufficient standing alone to render a confession involuntary.[32] In the instant case, the record does not

---

[32] *See State v. Davis*, 92-1623 (La. 5/23/94), 637 So.2d 1012, *cert. denied*, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994), where the court found that a confession was voluntary although defendant had

demonstrate that the defendant's comprehension was negated or that he was otherwise unconscious of the consequences of his confession. After a review of the testimony given at the motion to suppress hearing, as well as the trial testimony, we find no error in the trial court's denial of the defendant's motion to suppress his statements on the basis of alleged drug intoxication.

## ASSIGNMENT OF ERROR 5

In his fifth assignment of error, defense appellate counsel argues that the trial court erred by prohibiting defense counsel at trial from relying upon evidence of the defendant's intellectual disability in the guilt phase of the trial. He contends that this error was corrected by the Louisiana Supreme Court but not until after the State had already presented its case-in-chief. Counsel asserts that the error not only constrained the defense opening statement but also curtailed the defense cross-examination of witnesses, violating his constitutional rights to confront witnesses and to present a defense. He also argues that the curtailment of the opening statement prevented the defense from explaining to the jury and placing in context for them the defendant's cognitive abilities and the way in which they should interpret his actions, statements, and state of mind, as well as their implications for the insanity defense.

### *Opening statement by the defense*

On March 22, 2011, this Court issued its ruling that the defendant was allowed to present evidence of mental retardation, mental defect, and/or diminished mental capacity, for the purposes of La. C.Cr.P. art. 703(G) in the guilt phase of his trial, subject to a limiting instruction to the jury that it was not to consider this evidence as having any bearing on the defendant's mental capacity at

---

smoked three or four cocaine rocks the night before his 11:00 p.m. statement, as well as consumed several beers the day he confessed.

the time of the offense. On that same date, after receiving notification of this ruling, defense counsel made an oral motion to give a brief second opening statement limited to the issue of this Court's ruling. The State objected, and defense counsel indicated that he would like to give such an opening statement if the supreme court denied the writ. The trial judge said that they would "cross that bridge" when they got to it and that if it became an issue, then she would decide. Defense counsel said, "Okay." Following the trial court's ruling, the State's case continued with the testimony of Mr. Carroll and Lieutenant Meunier while the supreme court review was pending. The next day, on March 23, 2011, the supreme court issued its ruling, after which the State rested its case, and the defense presented its case. It does not appear that defense counsel ever gave a second opening statement, nor was the matter raised again on the record.

In the context of a first degree murder case, regarding a defendant's opening statement, the Louisiana Supreme Court has previously noted that, "[t]he defendant may make an opening statement if he chooses, but none is required of him by law. La. C.CR.P. art. 765." *State v. Smith*, 339 So.2d 829, 832 (La. 1976). If a defendant chooses to make an opening statement, a trial court has discretion to direct the timing of when the opening statement is given. For example, in *State v. Cathey*, 493 So.2d 842, 855 (La. Ct. App. 1986), *writ denied*, 500 So.2d 419 (La. 1987), the defendant advised the trial court that he wished to reserve the right to make an opening statement until after the State rested its case. The trial court agreed to do so. At the conclusion of the State's case, the defendant called his first witness without making an opening statement. On appeal, the defendant argued that the trial court erred by requiring that the defendant make his opening statement after the first state witness had testified rather than at the start of the defendant's case. In finding no merit to the argument, this Court reasoned that the defendant

had permissibly been allowed the opportunity to give an opening statement out of the normal order of trial:

> However, at the conclusion of the State's case, the defendant called his first witness without making an opening statement. Thus it may be concluded that the defendant waived his opening statement. The defendant has the right to waive an opening statement. C.Cr.P. art. 765; *State v. Seiss*, 428 So.2d 444 (La. 1983).

In the instant case, the defendant had placed the issue of a second opening statement before the trial court, which appeared amenable to the option. However, as in *Cathey, supra*, the defendant proceeded with his case without revisiting this issue or without further objection. Similar to our reasoning in *Cathey*, we find that the defendant waived any opportunity he may have had to a second opening statement. Even if this were not the case, we find no resulting prejudice from the absence of a second opening statement by the defendant. As will be discussed more fully below, the defendant was still given the opportunity and did, in fact, argue his intellectual disability defense before the jury in the guilt phase of the trial.[33]

### *Cross examination of the State's witnesses*

Next, appellate counsel argues that the defendant's trial counsel was prevented from cross-examining the State's witnesses regarding the defendant's mental retardation in order to show that there was reasonable doubt as to specific intent and that his intellectual disability combined with his mental illness created a likelihood of insanity.

In its case-in-chief during the guilt phase of trial, the State called the following witnesses: Dr. Karen Ross, Deputy Burgess, Sergeant Arnaud, Captain Thornton, Louise Walzer, Lieutenant Carrigan, Sergeant Dyess, John Carroll,

---

[33] *Compare, State v. Butler*, 615 So.2d 496, 502 (La. Ct. App. 1993), *writ denied sub nom. State ex rel. Butler v. Thirty Six Jud. Dist. Ct.*, 94-0634 (La. 6/28/96), 675 So.2d 1107.

Sergeant Dax Russo, Geneva Glapion-Refuge, Kenneth Smith, Lieutenant Meunier, Robert Zang, James Rome and Kyron Walker. Of these State's witnesses, only four had any type of interaction with the defendant at all during the investigation of Hwa Lee's murder.[34] Between those four State's witnesses, none were offered as experts, nor would have been qualified, to give an expert opinion regarding defendant's mental retardation. To the extent their lay opinions were relevant, these witnesses were questioned about their general impressions about whether the defendant appeared to understand various situations as they unfolded.[35]

At the time the State's witnesses testified, the defendant did not proffer what questions he would have asked the respective witnesses about the defendant's mental retardation. As this Court observed in *State v. Batiste*, 96-1010 (La. App. 5 Cir. 1/27/98), 708 So.2d 764, 769, *writ denied*, 98-0913 (La. 9/4/98), 723 So.2d 954:

> La. C.E. art. 103(A) states that error may not be predicated upon a ruling which admits or excludes evidence, unless a substantial right of the party is affected. Sec. A(2) of the same article provides that error may not be predicated upon a ruling excluding evidence unless the substance of the evidence was made known to the court by counsel. *State v. Lobato*, 603 So.2d 739, 748 (La. 1992), *appeal after remand*, 621 So.2d 103 (La. App. 2 Cir., 1993), *writ granted in part, denied in part on other grounds*, 627 So.2d 644 (La. 1993). In criminal cases, as well as civil cases, a party has a legal right, when evidence has been excluded, to make an offer of proof of what counsel expects to prove, outside of the presence of the

---

[34] As noted earlier, Ms. Glapion-Refuge and Mr. Smith testified regarding other crimes evidence. Ms. Glapion-Refuge stated during her testimony that the defendant did not appear to be "loaded or drunk" at the time of his attempted robbery of her and that he appeared to understand what was going on. Mr. Smith testified that the defendant "acted on his own" while he and Rojas were robbing him.

[35] Deputy Burgess testified that the defendant appeared to understand his directions when Burgess ordered the defendant and Rojas to exit the car. Sergeant Arnaud testified that the defendant was acting strangely at the time of his arrest, but denied having a conversation with the defendant. Lieutenant Meunier testified that, prior to taking the defendant's statement, he read the defendant's rights to him and that the defendant indicated he understood his rights. Lieutenant Meunier indicated he had no concerns about the defendant's mental state at the time the statement was given, and he did not believe that the defendant was intoxicated or under the influence of drugs. John Carroll testified that, prior to the defendant giving a statement, he went over the rights form again with the defendant and the defendant appeared to understand his rights.

> jury. *State v. Adams*, 537 So.2d 1262, 1265 (La. App. 4th Cir. 1989), *writ granted*, 543 So.2d 2 (La. 1989), *affirmed in part, reversed in part on other grounds*, 550 So.2d 595 (La. 1989); *State v. Searcy*, 621 So.2d 83, 88 (La. App. 2nd Cir. 1993); *State v. Lynch*, 94 0543 (La. App. 1st Cir. 5/5/95), 655 So.2d 470, 480. In *Lobato*, the Louisiana Supreme Court held that, where the defendant did not make known the substance of the excluded evidence for the purpose of consideration by the trial and appellate courts, the defendant did not preserve the alleged error for review on appeal. *State v. Lobato*, 603 So.2d at 749.

*Id*. at 769. Similarly, in the instant case, because defense counsel has not specifically indicated what evidence or testimony of the defendant's mental retardation counsel was prohibited from attaining from unnamed State's witnesses, we have no basis to review an alleged error. *See also*, *State v. Jones*, 02-267 (La. App. 5 Cir. 7/30/02), 824 So.2d 514, 516, *writ denied*, 02-2518 (La. 6/27/03), 847 So.2d 1254.

As previously noted, the Louisiana Supreme Court ultimately determined that evidence of the defendant's mental retardation was admissible in both the guilt and penalty phases of trial. *State v. Doyle*, 11-597 (La. 3/23/11), 56 So.3d 948. To the extent that the defendant believed at the time of trial that his case had been prejudiced by trial going forward as the ruling on the admissibility of the incapacity evidence was being considered on review, there is nothing in the record to suggest that the defendant sought to remedy the issue by recalling any of the State's witnesses for further cross examination after the supreme court's ruling, which could have been permissible under the trial court's discretion. *State v. Jones*, 02-267 (La. App. 5 Cir. 7/30/02), 824 So.2d 514, 516, *writ denied*, 02-2518 (La. 6/27/03), 847 So.2d 1254.[36] In any event, as previously discussed, defense counsel was able to present evidence of the defendant's mental retardation during the

---

[36] Although the trial court has discretion to allow a party to recall a witness after the witness has been dismissed, the trial court may deny permission to recall a witness if it will cause undue delay and if the facts show that the party had a reasonable opportunity on the witness' first appearance to question the witness about the matter for which recall is sought. *State v. Griffin*, 288 So.2d 636, 638 (La. 1974). *State v. Rodriguez*, 02-334 (La. App. 5 Cir. 1/14/03), 839 So.2d 106, 125, *writ denied*, 03-0482 (La. 5/30/03), 845 So.2d 1061.

penalty phase of his case through the testimony of Dr. Deland and in closing argument.

## ASSIGNMENT OF ERROR 6

In the sixth assignment of error, the defendant's appellate counsel argues that the trial court erred by forcing the defendant to trial in violation of his rights to a jury drawn from a fair cross-section of the community. Counsel contends that the trial court erroneously denied the defendant's motion to quash the venire, his request for a recess to permit further investigation, and his motion for new trial.

The proper procedural vehicle for alleging that the general or petit jury venire was improperly drawn, selected, or constituted is a motion to quash. La. C.Cr.P. art. 532(9); *State v. Armentor*, 19-1267 (La. App. 1 Cir. 7/31/20), 309 So.3d 762, 771, *writ denied*, 20-1032 (La. 2/17/21), 310 So.3d 1149. A motion to quash based on the ground that the petit jury venire was unconstitutionally drawn should be filed in writing prior to the beginning of the jury selection. *See Armentor, supra* (citing La. C.Cr.P. arts. 521, 532(9), and 535(C)). Under Louisiana law, grand or petit juries shall not be set aside for any reason unless fraud has been practiced or some great wrong committed that would cause irreparable injury to the defendant, or unless persons have been systematically excluded from the venire solely upon the basis of race. La. C.Cr.P. art. 419(A). The defendant bears the burden of proving grounds for setting aside a jury venire. *State v. Edwards*, 01-116 (La. App. 5 Cir. 6/27/01), 790 So.2d 109, 115, *writ denied*, 01-2235 (La. 8/30/02), 823 So.2d 935.

The required elements for making a *prima facie* showing of a Sixth Amendment fair cross-section violation, made applicable to the states under the Fourteenth Amendment, are set forth in *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). A defendant must show: (1) that the group

alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury selection process. After the defendant makes a *prima facie* case, the State has the burden of justifying this infringement by showing that the achievement of a fair cross-section is incompatible with a significant state interest.[37]

### *Pre-trial motion to quash the jury venire*

In his pre-trial motion to quash the jury venire, the defendant argued that the venire from which jurors were being selected was so unrepresentative as to violate his state and federal constitutional rights to a fair cross-section and to equal protection; that according to the 2009 census estimate, Jefferson Parish was nearly 27% African American; that the venire of 189 assembled for the instant case contained only 17% African Americans; that although 41 additional jurors were added to the venire, the total venire was still only 20% African American; that such under-representation denied the defendant his Sixth Amendment right to a trial of impartial jurors drawn from sources reflecting a fair cross-section of the community and to equal protection of the laws as guaranteed by the Fourteenth Amendment, citing *Castaneda v. Partida*, *supra*; that the defendant's venire demonstrated a *prima facie* case of a constitutional violation, citing *Duren v. Missouri*, *supra*; that without access to more information regarding the process used to summon the jurors in the instant case, the defendant was unable to fully plead and preserve his claim; and that even on the showing made, the State had the burden to rebut the defendant's *prima facie* case.

---

[37] *See also, Castaneda v. Partida*, 430 U.S. 482, 494-95, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977).

At the hearing on the motion to quash the jury venire, defense counsel made the same arguments that were advanced in the written motion. Also, she asserted that under the law, three things had to be shown: that the group alleged to be excluded, African Americans, was a distinctive group; that the numbers showed that representation of this group was not fair and reasonable in relation to the number of persons in the community; and that the under-representation was due to systematic exclusion of the group in the jury selection process. When the trial judge asked what proof defense counsel had of the third prong, defense counsel argued that "based on the numbers," she had made a *prima facie* showing and that the State had to rebut that showing. Defense counsel asserted that if the trial judge found that she had not made a *prima facie* showing, then she was asking for a recess to obtain additional information from jury management.

The State responded that La. C.Cr.P. art. 417 governed the manner in which petit jurors were summoned for jury duty. The prosecutor then called Pamela Thomassie, chief administrator for the jury pool administration for Jefferson Parish, as a witness. Ms. Thomassie testified she was currently employed by the Jefferson Parish Clerk of Court as the department head in the jury assembly room and that she had been so employed for 26 years. She further testified that based on her experience, she was familiar with the process used to summon jurors. Ms. Thomassie explained that she became aware for an increased number of jurors in the instant case when she received a call from the division, and through an order by the judge and jury commissioner. She also explained that the division had the Clerk of Court's office subpoena enough jurors to have a large jury pool. Ms. Thomassie stated that her office summoned 750 jurors to appear on February 25, 2011. She asserted that she typed an order to that effect and had the judge sign it. She stated that she also obtained an order from the jury commissioner for the

authority to pull those jurors. Ms. Thomassie explained that her office put the date, time, and number of jurors needed into the computer.

Ms. Thomassie testified that was the regular process she used on a regular day and that the selection of jurors from the system was random, and obtained from the driver's license bureau and from the registrar of voters. She stated that subpoenas were prepared and that a list was delivered to the JPSO. She noted that each juror was served by regular mail and that the summons was addressed to each of them at the residence listed on his voter registration or driver's license. Ms. Thomassie asserted that the summonses were mailed on January 25, 2011, more than fifteen days from February 25, 2011. She did not know the racial composition of the 750 jurors. She explained that some of the summonses were returned to them due to an incorrect address. Ms. Thomassie noted that she did not make any further effort to contact those persons. She did not know how often the list of jurors was updated.

In *State v. Turner*, 16-1841 (La. 12/5/18), 263 So.3d 337, 393-94, *cert. denied*, - - U.S. - -, 140 S.Ct. 555, 205 L.Ed.2d 355 (2019), the defendant filed a motion to quash the petit jury venire four days after *voir dire* began, alleging systemic and intentional under-representation of black panelists. He alleged that although African Americans represented 46.1% of the adult population in East Baton Rouge Parish, of the 182 jurors selected for the venire, only 63 were black, comprising just 34.6% of the venire, and representing an absolute disparity of 11.5%, and a comparative disparity of 24.9%. Although the motion was found to be untimely, the *Turner* court stated that although the defendant argued that disparity in the voter registration lists in comparison to the venire panel established purposeful discrimination, under *State v. Ashworth*, 97-2917 (La. 11/25/97), 704 So.2d 228, 229, this alone was insufficient to establish a Sixth Amendment

violation and that the defendant must also point to a "showing in the record of [a] discrimination against a class of people" in order to establish that a cross-section violation occurred in his case. The supreme court found that the defendant had not established entitlement to relief on this basis. It further found that nothing in the record or in the defendant's application suggested that the under-representation of black panelists generally, and black men specifically, was due to a systematic exclusion of the group, citing *Duren*, 439 U.S. at 364, 99 S.Ct. at ____.The Louisiana Supreme Court asserted that the director of jury management at the 19th Judicial District Court had testified that the court used an automated software program that performed a "random pull" of the names from the voter registration logs and DMV records to send out 325 summonses in each case that required a jury. The supreme court concluded that because defendant failed to show "systematic exclusion," he was not entitled to relief.

In the present case, although defense counsel may have arguably established the first two prongs of *Duren*, i.e., that the group alleged to be excluded was a "distinctive" group in the community and that the representation of this group in venires from which juries are selected was not fair and reasonable in relation to the number of such persons in the community, the defendant did not establish the third prong of *Duren*, namely, that this under-representation was due to systematic exclusion of the group in the jury selection process.

Similar to the process identified in *Turner*, in the instant case, Ms. Thomassie, the chief administrator for the jury pool administration in the Jefferson Parish Clerk of Court's Office, testified that the Clerk of Court's office used a computer system to randomly select jurors in order to send out summonses. She explained that they obtained the names of jurors from the driver's license bureau and from the registrar of voters. After a review of the record, we find that the

defendant failed to show systematic exclusion in the venire. Accordingly, we find no error in the trial court's denial of the defendant's initial motion to quash. *See also*, *State v. Brooks*, 01-864 (La. App. 5 Cir. 1/29/02), 807 So.2d 1090.

### *Post-trial motion to quash the jury venire*

Prior to sentencing, on July 25, 2011, defense counsel filed a motion for new trial under La. C.Cr.P. art. 851(2), (4), and (5), challenging the trial judge's denial of the motion to quash the venire. In his motion, counsel made the same arguments he made in his motion to quash the venire, namely, that there was racial discrimination in the selection of the jury. Additionally, defense counsel stated in the motion that on July 12, 2011, the United States government had filed suit against the State of Louisiana, the Louisiana Secretary of State, and various state agencies for violating the National Voter Registration Act (NVRA).

On July 25, 2011, defense counsel also filed a motion to continue sentencing asking for a continuance in order to develop his motion for new trial with respect to the issue regarding the venire. The trial court denied the motion to continue, stating that defense counsel had plenty of time to investigate that particular issue. Defense counsel filed a writ application with this Court challenging the trial court's denial of his motion to continue that was denied on the showing made on July 26, 2011. *State v. Doyle*, 11-K-749 (La. App. 5 Cir. 7/26/11) (unpublished writ disposition). On July 27, 2011, a hearing was held on the motion for new trial. Following arguments of counsel, the trial judge denied the motion without providing reasons. The trial judge had indicated earlier in the hearing that the claim could not be granted if it would require a full hearing of the NVRA claim.

In *State v. Nix*, 327 So.2d 301 (La. 1975), *cert. denied sub nom.*, *Fulford v. Louisiana*, 425 U.S. 954, 96 S.Ct. 1732, 48 L.Ed.2d 198 (1976), the Louisiana Supreme Court addressed the issue of whether the defendants in a first degree

murder trial properly raised a jury venire issue in post-trial motions that were originally denied pre-trial. In finding that assignment to be without merit, the court explained:

> Bills Nos. 123 and 124 were reserved post-trial to the denial of duplicate motions for new trial and/or in arrest of judgment and evidentiary hearing to attack the composition of the petit jury venire. These post-trial motions were properly denied, as defendants were afforded an evidentiary hearing on their pre-trial motions to quash. The allegations do not fall within the grounds for a motion for a new trial, La. C.Cr.P. art. 851, nor within the grounds for a motion in arrest of judgment, La. C.Cr.P. art. 859.

*Id.*, at 322. As in *Nix*, the record in the instant case shows that the defendant was afforded a full hearing on his pre-trial motion to quash the jury venire and failed to meet his burden of demonstrating that he was entitled to relief. Accordingly, we find no error in the trial court denying the motion for new trial on an evidentiary basis, as well as the procedural issue that challenging the jury venire was not within the grounds upon which to base in a motion for new trial.

## ASSIGNMENT OF ERROR 7

Defendant's appellate counsel argues that the trial court erred in denying his Second Motion for New Trial based upon new and material evidence of intoxication at the time of the offense. He contends that the trial court erred in finding that the defendant's trial counsel did not use reasonable diligence to discover this information prior to trial and that the pre-trial period was sufficiently lengthy to have allowed the information regarding intoxication to be developed. Counsel argues that the denial of his Second Motion for New Trial based on this ground resulted in a violation of his rights to due process, to a fair trial, and to present a defense.

On March 28, 2012, defense counsel filed a Second Motion for New Trial, arguing that under La. C.Cr.P. art. 851(2), (3), (4), and (5), the defendant was

entitled to a new trial because there was new and material evidence of intoxication at the time of the offense. In his motion, defense counsel asserted that at trial the defense presented some evidence and argument regarding the defendant's intoxication but that the best source of evidence, co-defendant Rojas, did not become available until after the defendant's trial and sentencing hearing. The defendant contended that Rojas was the only individual who had the opportunity to observe defendant and his drug use in the days, hours, and minutes before the crime. Defense counsel asserted in his Second Motion for New Trial that Rojas pled guilty and was sentenced on August 23, 2011, and as a result, became available to the defendant's attorneys for the first time. He further asserted that he met with Rojas and obtained a signed statement regarding his and the defendant's drug use. In his statement, attached as Exhibit A, Rojas said that on the night of the crime, he and the defendant had been awake for two days drinking alcohol and using a substantial amount of drugs, including cocaine, heroin, and Xanax. Rojas said that the defendant injected the cocaine and heroin intravenously. Defense counsel explained that at trial they relied upon circumstantial evidence of the defendant's drug use but now they had direct evidence of it from Rojas.

In his Second Motion for New Trial, defense counsel stated that when he provided this new information to Dr. Deland, the forensic psychiatrist who testified for the defense at trial, she stated in a declaration, attached as Exhibit B to his motion, that the impact on defendant's mental state of the drug use described would have been profound and would have greatly increased his existing impairments. She concluded that if the defendant consumed these drugs as described by Rojas, there was at least a reasonable probability that his intoxicated or drugged condition would have precluded the presence of a specific intent to kill or inflict great bodily harm at the time of the killing.

Defense counsel argued in the Second Motion for New Trial that this newly discovered evidence would probably have changed the verdict or judgment of guilt and warranted a new trial under La. C.Cr.P. art. 851(3). He also argued that this evidence would have corroborated the evidence of intoxication available at the suppression hearing and refuted the suggestions that the defendant was sober when interviewed. Defense counsel contended that it was likely that the motion to suppress would have been granted if this new evidence had been available.

At the hearing on the Second Motion for New Trial, on May 1, 2013, the State and the defense stipulated that if called, the witnesses who prepared the statements attached to the motion as Exhibits A through H27 would testify in accordance with their statements. Defense counsel subsequently argued why the motion should be granted, and the prosecutor responded that the jury had already heard evidence of the defendant's possible intoxication. After hearing arguments of counsel, the trial court denied the Second Motion for New Trial.

Defendant's Second Motion for New Trial on the grounds of new evidence of intoxication was based on La. C.Cr.P. art. 851(2), (3), (4), and (5). La. C.Cr.P. art. 851 provides in pertinent part:

> A. The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
>
> B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:
>
> ****
>
> (2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error.
>
> (3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.

(4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment.

(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right[.]

La. C.Cr.P. art. 854 provides, in pertinent part, as follows:

A motion for a new trial based on ground (3) of Article 851 shall contain allegations of fact, sworn to by the defendant or his counsel, showing:

1) That notwithstanding the exercise of reasonable diligence by the defendant, the new evidence was not discovered before or during the trial;

2) The names of the witnesses who will testify and a concise statement of the newly discovered evidence;

3) The facts which the witnesses or evidence will establish; and

4) That the witnesses or evidence are not beyond the process of the court, or are otherwise available.

Additionally, the jurisprudence imposes the following four requirements for a motion for new trial based on new evidence: 1) the evidence must have been discovered since the trial; 2) failure to learn of the evidence at the time of trial must not be due to defendant's lack of diligence; 3) it must be material to the issues at the trial; and 4) it must be of such a nature that it would probably produce an acquittal in the event of a retrial. *State v. Richoux*, 11-1112 (La. App. 5 Cir. 9/11/12), 101 So.3d 483, 489, *writ denied*, 12-2215 (La. 4/1/13), 110 So.3d 139. The trial court's determination as to whether these requisites are met is entitled to great weight, and its denial of a new trial will not be disturbed on appeal absent a clear abuse of that discretion. *Id*.

The denial of a motion for a new trial is not subject to appellate review except for an error of law. La. C.Cr.P. art. 858. Further, the ruling on a motion for a new trial is committed to the sound discretion of the trial judge and will not be disturbed on appeal absent a clear showing of abuse of that discretion. *State v.*

*Bibbins*, 13-875 (La. App. 5 Cir. 4/9/14), 140 So.3d 153, 167, *writs denied*, 14-994 (La. 12/8/14), 153 So.3d 439 and 14-1015 (La. 12/8/14), 153 So.3d 440.

In the instant case, we do not find that Rojas' affidavit indicating that defendant was under the influence of a substantial amount of drugs at the time of the offense was of such a nature that it would have produced an acquittal in the event of a retrial. *See Richoux, supra*. Evidence that the defendant was possibly intoxicated or under the influence of drugs was already admitted at trial and heard by the jury. Mr. Rome testified that the man who exited the Cadillac prior to going into the convenience store looked like he was "loaded pretty good" and "good enough to wobble." Further, Sergeant Arnaud testified that after the Cadillac was stopped, she called EMS because the defendant was sweating "profusely," "kind of shaking," and did not answer when she asked if he was okay. She further explained that defendant was acting "strange," and she thought that he "might have taken something."

In light of the foregoing, we find that the trial court did not abuse its discretion by denying the Second Motion for New Trial on the basis of new evidence of intoxication.

## ERRORS PATENT REVIEW

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990). The review reveals no errors patent in this case that require correction.

## DECREE

For the foregoing reasons, the defendant's conviction and sentence are affirmed.

**CONVICTION AND SENTENCE AFFIRMED**

STATE OF LOUISIANA                           NO. 21-KA-257

VERSUS                                       FIFTH CIRCUIT

ISAIAH DOYLE                                 COURT OF APPEAL

                                             STATE OF LOUISIANA


**JOHNSON, J., DISSENTS WITH REASONS**

I respectfully dissent from the majority opinion.

In his fifth assignment of error, Defendant argues that the trial court's ruling prohibiting the defense counsel from providing evidence regarding his intellectual disability in the guilt phase of trial violated his constitutional rights. Defendant further argues that the ruling denied him the opportunity to provide context for his behavior and actions, from the time of the offense through the sentencing phase of the trial.

> The right of confrontation occupies the status of a paramount and fundamental right indispensable to a fair trial. It is a substantial, substantive and valuable right which assures the accused that he shall have the opportunity to be confronted by the witnesses against him and this includes not only the right to attend the trial and hear the witnesses but also the right to cross-examine them at the trial. It is a constitutional right, not a mere privilege.

*State v. Giordano*, 259 La. 155, 160; 249 So.2d 558, 560 (La. 1971).

Here, Defendant entered a plea of not guilty and not guilty by reason of insanity. Defense counsel had the opportunity to present evidence regarding Defendant's mental retardation, defect, diminished capacity, and/or illness, but only after the State completed the presentation of its case-in-chief. The Louisiana Supreme Court found that the district court committed error when it prohibited the defense from introducing such evidence "at the guilt phase of the trial, as part of the circumstances surrounding the making of a confession for jurors to consider in determining the weight or probative value given the statement." *See State v.*

*Doyle*, 11-597 (La. 3/23/2011) (unpublished writ disposition). In light of Defendant's plea of not guilty and not guilty by insanity, the supreme court further determined that Defendant was also entitled to present evidence in attempts to show that, because of a mental disease or defect, he was unable to distinguish between right and wrong at the time of the offense. *Id.*

"The proper analysis for determining harmless error 'is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.'" *State v. Harris*, 97-0300 (La. 4/14/98); 711 So.2d 266, 271–72 (Kimball, J., dissent). "[I]t bears emphasizing that when a court reviews trial error, it requires a court to determine not only that the trial error was harmless but that the trial error was harmless beyond a reasonable doubt." *State v. Bartie*, 19-497 (La. App. 3 Cir. 1/22/20); 289 So.3d 1106, 1122–23 *citing Langley*, 958 So.2d 1160.

> The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee.

*Sullivan v. Louisiana*, 508 U.S. 275, 279; 113 S.Ct. 2078, 2081–82; 124 L.Ed.2d 182 (1993).

> Confrontation errors are subject to a *Chapman* [*v. State of Cal.,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ] harmless error analysis. The correct inquiry is whether the reviewing court, assuming that the damaging potential of the cross-examination were fully realized, is nonetheless convinced that the error was harmless beyond a reasonable doubt. *Id.* at 684, 106 S.Ct. at 1438. Factors to be considered by the reviewing court include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*State v. Hawkins*, 96-766 (La. 1/14/97); 688 So.2d 473, 478 (Citations omitted).

After reviewing the record in this matter, I am not convinced that, but for the trial court's earlier erroneous ruling excluding evidence of Defendant's mental retardation and illness, the jury would have still found Defendant guilty, as opposed to not guilty and not guilty by reason of insanity. Without the trial court's error, the defense may have been able to elicit lay opinions, particularly from the four Jefferson Parish Sheriff's Office personnel who interacted with Defendant. Such testimony could have be considered cumulatively by the jury—along with the testimony offered by the defense's expert, Dr. DeLand—and found relevant and persuasive. Because the State presented its case-in-chief to the jury without the defense being able to advocate for any consideration of Defendant's mental retardation, defect, diminished capacity, and/or mental illness, the trial court's error irrevocably tainted the entire trial. It is implausible that the guilty verdict was surely unattributable to the trial court's error. Additionally, I do not find that the defense's presentation of evidence and testimony, or the opportunity to give an additional opening statement, or to recall and further cross-examine the State's witnesses cured the trial court's error or rendered the error harmless.

Further, I find that La. C.E. art. 103(A)[38] does not apply to this matter. A criminal defendant has a constitutional right to present a defense. *State v. Bowen*, 01-594, p. 5 (La. App. 5 Cir. 12/26/01); 806 So.2d 749, 752, *writ denied,* 02-264 (La. 10/25/02); 827 So.2d 1170 *citing* La. Const., art. I, § 16. Defendant timely objected to the trial court's evidentiary ruling by taking writs and requesting a stay.

---

[38] La C.E. art 103(A):
> **A. Effect of erroneous ruling.** Error may not be predicated upon a ruling which admits or excludes **evidence** unless a substantial right of the party is affected, and
> **(1) Ruling admitting evidence.** When the ruling is one admitting **evidence**, a timely objection or motion to admonish the jury to limit or disregard appears of record, stating the specific ground of objection; or
> **(2) Ruling excluding evidence.** When the ruling is one excluding **evidence**, the substance of the **evidence** was made known to the court by counsel.
> **(Emphasis in original).**

An appellate panel cannot possibly know what a jury might have done if the case had been tried without error. Therefore, if there is any serious doubt on this score, the case ought to be returned to the jury.

The most serious flaw in the guilt-based approach, however, is its tendency to undermine our most important legal principles. [ … A]ny analysis measuring the harmlessness of error according to the weight of the evidence that the prosecution stacks against a defendant erodes the individual rights and liberties that are presumed to elevate our system of justice. A focus on guilt skews the judicial assessment of harmlessness.

Harry T. Edwards, *To Err Is Human, but Not Always Harmless: When Should Legal Error Be Tolerated?*, 70 N.Y.U.L. Rev. 1167, 1193–94 (1995).

I acknowledge that facts in this case leave little doubt of Defendant's factual guilt or culpability. However, my concern, in affirming versus vacating the jury verdict, is establishing jurisprudence that such erroneous interference with a defense's case amounts to harmless error, when, in fact, it could be the difference in a defendant being found not guilty and not guilty by reason of insanity by a jury of his peers.

For the foregoing reasons, I would vacate the jury verdict on the basis that the trial court erred by prohibiting the defense from relying upon evidence of Defendant's intellectual disability in the guilt phase of the trial and remand the matter.

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN S. BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **DECEMBER 22, 2021** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 21-KA-257

### E-NOTIFIED

24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE JUNE B. DARENSBURG (DISTRICT JUDGE)
DARREN A. ALLEMAND (APPELLEE)          JACQUELINE F. MALONEY (APPELLEE)          THOMAS J. BUTLER (APPELLEE)
RICHARD J. BOURKE (APPELLANT)

### MAILED

CHRISTINE M. LEHMANN (APPELLANT)          HONORABLE PAUL D. CONNICK, JR.
ATTORNEY AT LAW                           (APPELLEE)
636 BARONNE STREET                        DISTRICT ATTORNEY
NEW ORLEANS, LA 70113                     VINCENT J. PACIERA, JR. (APPELLEE)
                                          ASSISTANT DISTRICT ATTORNEY
                                          TWENTY-FOURTH JUDICIAL DISTRICT
                                          200 DERBIGNY STREET
                                          GRETNA, LA 70053